E-FILED

Thursday, 01 November, 2012  08:43:56 AM

Clerk, U.S. District Court, ILCD

United States District Court

Central District of Illinois

Peoria Division

| | |
|---|---|
| Roberto Castellanos, | ) |
| Pro Se-Plaintiff | ) |
| | ) |
| Vs | ) Case No._____ |
| | ) |
| Randy Pfister | ) |
| James Blackard | ) |
| Glendal French | ) |
| Susan Prentice | ) |
| Donald Boitnott | ) |
| Terrance Durbin | ) |
| David Hall | ) |
| Paul Griffith, | ) |

" Complaint with Jury Demand "

This is a civil action filed by Roberto Castellanos Prison
NO.K81133 a state prisoner for damages and injunction relief
under the 42 Us.c. 1983 alleging the following:

A. Defendants retaliated against him for engaging in an activity
protected by the First Amendment Rights, the right to freedom
of speech and to petition the Goverment fo r redress of grievance
a violation of the United States Constitutional First Amendment
Rights.

B. Defendants acted with deliberate indifference, evidenced
by an actual intent to inflict the most inhumane, unsanitary
and unnecessary conditions of segragation confinement by denying
him the basic human necessites of life causing severe emotional
distress and humilation or knew that thier was a high probabil-
ity that thier conduct would do so without  any reguards to
the plaintiff health and safety, a violation of the United States
Constitutional Eighth Amendment RIghts.

C. Defendants knowingly allowed thier subordinates to enforce
thier own use of forbidding punishment that is so totally without

penological justification that it results in the gratitous in-
fliction of pain and suffering, a violation of the United States
Constitutinal Eighth Amendment Rights under the cruel and unusal
punishment clause.

## I. Federal Jurisdiction

This court has jurisdiction over plaintiffs claims pursuant
to 28 U.S.C. 1331, 1343(a) (3) and 1367 (a). Venue is proper
in the Central District of Illinois under 28 U.S.C. 1391(6)
because  at least on defendant resides in this district and
all events giving rise to plaintiff claims occured in this dis-
trict.

## " II. Parties "

A. PLaintiff Robeto A. CAstellanos prison No. K81133 is presently
incarcerated at henry C. Hill Corr. Center, 600 S. Linwood Rd.,
Galesburg, Illinos. 61401

B. Defendant #1. Randy pfister is the Warden at Pontiac Correct-
ional Center 700 W. Lincoln St., Pontiac, Illinois. 61764

Defendant #2. James S. blackard is a Major at Pontiac Correct-
ional Center, 700 W. Lincoln St., Pontiac, Illinois. 61764

Defendant #3 Glendal French is a Luitenant at Pontiac Correct-
ional Center, 700 W. Lincoln St., Pontiac, Illinois 61764

Defendant #4 Susan Prentice is a Lutienant at Pontiac Correct-
ional center, 700 W. Lincoln St., Pontiac Illinois 61764

Defendant #5 Donald Boitnott is a Correctional Officer at
Pontiac Correctional center, 700 W. Lincoln St., Pontiac Illinois
61764.

Defendant #6 Terrance Durbin is a Correctional Officer at
Pontiac Correctional center. 700 W. Lincoln St., Pontiac Illinois
61764

Defendant #7 David Hall is a Correctional Officer at Pontiac
Correctional Center, 700 W. Lincoln St., Pontiac, Illinois 61764

Defendant #8 Paul Griffith is a Correctional Officer at Pontiac
Correctional Center, 700 W. Lincoln St., Pontiac Illinois 61764

All defendants are sued in thier offical capacities and in thier
personal capacities.

All defendants have acted and continue to act under color of
the State Law at all times relevant to this complaint.

## " III. Litigation History "

Plaintiff has not brought any other lawsuits in any State
or Federal Court dealing with the same facts involved. Plaintiff
has never brought any other lawsuits in any State or Federal
Courts while incarcerated.

## " IV. Exhaustion of Remedies "

Plaintiff assertsthat he has filed three emergency grie-
vances with exhibits out that only two of those were answered
to an extent only, both were appealed and denied by the Director
of the Illinois Department of Correction

## "V. Statement of Claim

Place of occureence; The west cell house, Cell#102
at Pontiac Correctional Center.

Date of occurrence; PLaintiff complaint runs from July
15th, 2011 through November 8th, 2011 with a specific focus
on the first seventy (70) hour period, friday 12pm through mon-
day 10 am. July 18th, 2011.

1. Plaintiff was an inmate at Pontiac Correctional Center from
Feburary 16, 2011 to Feburary 29, 2012,

2. On the moning of July 12, 2011 the plaintiff had written
Asst. Warden reed and west cell house Major Blackard a letter
concerning the improper treatment within this facility.

3. Later that afternoon c/o B. Jarrell appeared at plaintiffs
cell #416 within the west cell house and ordered him to get
dressed and to cuff up, because Major Blackard wanted to speak
to him.

4. Plaintiff was escorted downstairs where the Major was wait-
ing, Blackard read the plaintiffs letter outloud back to him
infront of c/o B. Jarrell and said that he would not rectify
any of plaintiff's complaint, threating instead to write me
a disciplinary report and make my stay in segragation a living
hell if plaintiff declared a hunger strike.

5. PLaintiff replied , its already a living hell in here and
declared a hunger strike, Consequently plaintiff was then escort-
ed to the North cell house where they housed na entire gallery
of hunger strikers on a temporary basis.

6. On the morning of July 15, 2011 the Asst. Warden Mr. Reed
took the corrective action that the plaintiff complaint about
and terminated his peacful protest.

7. Later that afternon, PLaintiff was escorted back to the west
cell house upon entering the WCH, the cage operator c/o D. Boit-
nott ordered c/o T. Durbin to put plaintiff in cell #102.

8. Immediately after c/o t. Durbin opened the entry steel door
to cell #102 the rancid stink like a sweating sewer was coming
from inside the cell and plintiff started complaining asking
to be placed in another cell.

9. C/O T. Durbin gave plaintiff two direct orders to get in
to that cell or recieve a disipinary report for disobeying a
direct order.

10. Plaintiff unwillingly complied with c/o T. Durbin  orders without causing any disturbance.

11. c/o T.Durbin quickly slammed the steel entry door behind the plaintiff, he immediately notice that 80% percent or more of the cell was smeared in feces and urine deposits, including the single metal bunk and toliet-sink area, two areas frequently used by inmates in their cells.

12. Seconds after plaintiff was uncuffed he went to the toliet sink area to vomit and quickly discovered that the main water supply valve to cell #102 was shut off! There was no running water to flush the toliet, nor was there any water coming out of the faucets  for the purpose of cleaning,drinking and or washing up.

13. Plaintiff also notice that there was no mattress in cell #102 for the purpose of laying down, sitting up and or sleeping on.

14. Plaintiff turned to c/o T. Durbin and asked for cleaning supplies a mattress and the main water supply to be turned back on. c/o T. Durbin denied the mininmal civilized measure of life necessities to the palintiff and disregaurded the seriousness of the plaintiff present state of confinement posing a substancial risk of serious harm.

15. Shortly after c/o T. Durbin walked off, plaintiff went to turn on the light to further inspect the cell and discovered that one of the flourescent light bulbs was burnt out causing the flourescent light to flicker and making the quality of light impossible to read and to live with. Which when left on for fours at a time during the feeding 3x a day and the institutional count 5x a day caused plaintiff headaches, fatigue and deprivation of sleep.

16. Plaintiff aslo discovered thatthere was no electrical outlets like in most cells in Pontiac C.C. to plug in a personal fan to ventilate the dangerously high heat index which was al-

ready 95°and higher without adding the humidity factor to it.

17. PLaintiff also discovered that the only ventilation suystem
in working condition in cell #102 was purposely covered up with
plastic shields which kept any air from circulating in and out
of the cell, intoxication the plaintiff with the rancid smell
of the feces and urine deposits.

!8. Later that afternoon while c/o Griffth made the daily last
rounds during the 7 a.m. to 3 p.m. shift, plaintiff informed
him the seriousness of the cellscondition and about the supplies
needed to make the conditions safer and more tolerable.

19. c/o P. Griffith replied, "too bad ! you shouldn't be trying
to sue the state for money. None of us feel sorry for you. So
deal with it." Then walked off with a knowing willingness disre-
gaurded of a substancial and excessive risk of serious harm
by exposing plaintiff to someone elses bodily fluids including
maybe blood and other infectious desease.

20. Plaintiff was then compelled by his fears an axiety to take
off his segregation jumpsuit, boxer shorts and socks to use
as rags and to use the unsanitary toitet water to clean a safe
area (2'feet x 6'feet) on the concreate floor closests to the
steel metal entry door way because:

A) The only place where any fresh air was circulating in or
out of that particular cell was coming from the gap underneath
the steel metal entry door and:
B) It was the far thest from the largest amount of feces and
urine deposits.

21. Plaintiff slept naked on the contaiminated concrete floor
because:
A) He was deprived of his personal clothing, B) was not provided
with any bed sheets, C) or blankets and Dj a mattress.

22. On the early morning hours of July 16, 2011 plaintiff was
denied a styrofoam cup and tray to allow for a little ice which
was being passed out by Lt. French and C/o P. Griffith twice

a day because:

A) Of the high heat temperatures of 95˚ degress
B) and approaching or exceeding 100 degrees as heat index which
made the fecal and urine deposits that much more diffcult to
breath inor live with.

23. On the early morning hours of July 17, 2011 plaintiff in-
formed Warden Pfister as he made his daily rounds in the west
Cell House of the seriousness of the cell #102 present state
of the confinement that plaintiff was forced to live with due
to the W.C.H. prison staff conduct. Which the fact that defend-
ants made daily rounds support  a claim of knowledge and a
conious disregguard for a substantial risk of serious harm to
plaintiff.

24. On the early morning hours of July 18, 2011 c/o Griffith
awoke plaintiff, gave plaintiff a segragation jumpsuit, ordered
him to cuff up and placed him in the tank holding cell across
from cell #102.

25. c/o P. Griffith then ordered the M.S.U. farm worker "Allen
Krohenberger #K62101 to make sure that this time around to do
a through cleaning, from ceiling to floor including the metal
single bunk and toilet sink area.

26. c/o P. Griffith also instructed the M.S.U. farm worker
"Allen Kronenberger #K62101 to bring plaintiff a mattress and
styrofoam cup once the cell was completely cleaned and disinfec-
ted.

27. c/o Griffith later ordered the M.S.U. Farm worker Allen
Kronenberger #K62101 to accompany the defendant into the tunnel
area behind the plaintiff cell for the purpose of turning the
water supply valve back on in Cell#102 (See exhit #1)

28. PLaintiff was dehydrated due due to the deprivation of water
and ice to drink for the past seventy (70) hours, equivelant
to three(3) full days, while constantly sweating uncontrollably

because of the high heat temperatures, humidity and malicious
condition of confinement and punishment causing plaintiff to
experiencedizziness, dry cotten mouth and fatigued without ever
being sanctioned by the adjustment committee(see #2 and #3)

29. Later that same afernoon warden Pfister and asst. warden
Reed stopped by plaintiff door to inspect the cells condition
while making thier daily rounds in west cell house.

30. Plaintiff then complainted to warden Pfister about the fact
that (A). The only ventalation system in that particular cell
was covered up with see-through plastic shields, keeping  the
air supply from circulating in and out of the cell causing
breathing difficulties and debasement,(B) the burnt out light
bulb in the cell caused the flourescent light to flicker dur-
ing all four (4) institutional counts and allthree feedings
causing inadequatelightening for eating, reading and sleep de-
privation and (C) plaintiff was denied his personel property
(ie;clothing and hygene items, mail, and writing materials)
affirming constitutionality.

31. Warden Pfister replied;"I'll talk to the major to see if
he will release your property as soon as possible and let the
gallery officer c/o P. Griffith and cage operator know to put
in a work order to fix the burnt out light fixture then walked
off having knowledege and a concious diregarded for a substan-
cial risk of serious harm to the plaintiff or knew that thier
actions would probablly would do so.

32. Plaintiff was literally forced to sleep on bio hazzardous
contaiminated concrete floor, prohibited the frequent use of
toliet, bedding's, wash bowl, styrofoam cup or tray for the
purpose of drinking water and cold ice cubes during the hig
heat temperatures of 95 degrees and approaching or exceeding
the 100 degrees with humidity and sanitory facilities for a
period of seventy(70) hours, equivalent to three (3) days, by
all the above named defendants, a violation of the Eighth
Amendment under both the Cruel and Unusual Punishment Clause
and the Deliberate Indiffrence Clause.

33. On the early morning hours of July 21, 2011 plaintiff received what was left of his personal property and asked c/o Riggenbouc to get him a Luitenant.

34. Lt. French appeared and replied, "I don't have any of your property. Nor do I know where it's at " then walked off plaintiffs door.

35. Later that afernoon plaintiff stopped c/o P. Griffith and asked the defendant to put in a good word for him to get his property and maybe get moved out of cell #102.

36. c/o P. Griffith resonded,"I know you're suing the state for money, you told me yourself. I don't care about your dam items or your rights and niether does anyone of us that work here. As far as I'm concerned you aren't getting moved out of this cell until your released from prison. So do not ask me for any favors! ".

37. On the afternoon hours of July 25, 2011 Major Blackard stopped by plaintiffs door removed the see-through plastic shield covers that were completely covering the only little ventilation into this particular cell. See exhibit #4

38. On the early morning hours of July 27,2011 plaintiff asked c/o Riggenbouc to move him out of this particular cell.

39. c/o Riggenbouc replied, if it werent for the fact that you have a "Do not move " notation by your name on the west cell house board, I would've moved you along time ago.

40. PLaintiff asked c/o Riggenbouc why would someone write a notation "Do not move " by my name on that board?

41. c/o Riggenbouc replied, "Because you sent that letter to the major and this is the way that they punish those whom go against the grain

42. On the early morning hours of august 12, 2011 plaintiff stopped Warden Pfister while making his rounds in the west cell house and asked him why were they denying him the right of exhausting his remedies throught the administrative Procedural System at Pontiac C.C?

43. Warden Pfister admited having knowledge of seeing three (3) emergency Grievances but stated quote "Someone else appointed by me takes care of that stuff unquote" See exhibit #5

44. On the early morning hours of August 13, 2011 plaintiff was awoken and cuffed up by c/o B. Jarrell and escorted to the tank holding cell across cell #102. Because the Maintance Department Personel was here to fix the burnt out light bulb. Which the plaintiff was forced to live with for the past seventy hundred (700) hours equirement to thirty (30) days, a violation of the eighth Amenmant Rights under the cruel and Unusual Punishment Clause

45. On the early morning hours of August 17, 2011 plaintiff Was finally moved out of cell House. PLaintiff was finallyd moved out of cell #102 and placed in cell #416 within the west cell house. PLaintiff was then and only then provided a pillow, two sets of sheets and a blanket, affirming constitutionality

46. On the early morning hours of August 20, 2011 plaintiff was moved out of the west cell house and into the east cell house.

47. On the evening of september 3, 2011 plaintiff received notification that he was approved to receive his T.V. on or about September 12, 2011. See exhibit #6

48. On the early morning  hours of september 14, 2011 plaintiff asked MAjor Blackard while making his daily rounds in the east and west cell house's that he had been approved for his T.V. set as of the 12th  of september and would appreciate if the Major called the property personnel to release plaintiffs T.V. set .

49. Major Blackard replied, " What! Who in the hell authorized
you to receive your T.V. ? That must be a mistake because the
only individual who has that kind of authority is me and I've
never given anyone permission to reinstate you any audio visual
privilages. So,now, let me see those documents"

50. Plaintiff presented the documents in question and was able
to notice that the Major was acting in bad faith (see exhibits# 6)
_____ )

51. Plaintiff did not receive his audio-visual equipment until
Octber 13, 2011 and the only reason why plaintiff recevied his
audio-visual was because he had declare a hunger strike to peace-
fully protest the majors abuse of authority and the constant
retaliation.

52. On the early mourning hours october 21, 2011 plaintiffs
cell was searched by c/o R. Hall and personal clothing items
were confiscated (see exhibits# 7     ) c/o R. Hall informed
the plaintiff that Lt. Prentice had received orders from Major
Blackard to keep the plaintiff on her rador.

53.On the evening hours of November 6,2011 c/o Gish was passing
out cleaning supplies for the cell and indigent bags for thsoe
inmates who were indigent. Plaintiff asked c/o Gish, "Isnt my
name on one of those indigent bags?"

 c/o Gish replied, "You must money on your trust fund account
or you're managed to be an someones shit list. If I were you
I'd write a grevance and attach a copy  of your trust fund ac-
count to prove that you are an indigent person(See exhibit #8
_____ )

<u>RELIEF REQUESTED</u>

1. Plaintiff seeks compensatory damages from the defendants
(Randy Pfister, James S. Blackard, Glendal French, Susan Prentice
Donald Boitnott Paul Griffith, Terrance Durbin and David Hall)
in the sum amount of $200,000,each

2.Plaintiff seeks punitive damages from the defendants (Randy
Pfister, James S. Blackard , Glendal French, Susan Prentice,

Donald Boinott, Paul Griffith, Terrance Durbin and David Hall)
in the sum amount of $450,00 each.


I, Roberto A Castellanos #K81133, herby declare that the fore-
going complaint is based on actual facts and to be true under
penalty of perjury.
Dated: 10·31·12

/s/ *Roberto Castellanos*
Roberto A. Castellanos #K81133
Hill Correctional Center
600 S. Linwood Rd, P.O. Box 1700
Galesburg, Illinnis      61402

Exhibits !

Exhibit #1

STATE OF ILLINOIS    )
                     )
COUNTY OF            )

## AFFIDAVIT

I _Allen Kronenberger  #K62101_ do hereby declare and affirm that the following information within this affidavit is true and correct in substance and in facts.

I WAS AN INMATE AT THE PONTIAC MEDIUM SECURITY UNIT DURING OCTOBER, 1, 2010 THRU SEPTEMBER, 27, 2011. MY WORK ASSIGNMENT WAS A PORTER DURING THE 7:00 A.M. TO 3:00 P.M. SHIFT AT THE WEST CELL HOUSE, MAXIMUM SECURITY UNIT OF PONTIAC CORRECTIONAL CENTER IN PONTIAC ILLINOIS. ON THE 15TH OF JULY, 2011 DURING THE 7:00 A.M. TO 3:00 P.M. SHIFT AS A PORTER IN THE WEST CELL HOUSE C/O GRIFFITH ORDERED ME TO ACCOMPANY C/O DURBIN TO CELL #102 AND TO REMOVE THE MATTRESS OUT OF THAT CELL BECAUSE THEY HAD AN INMATE COMING FROM THE NORTH CELL HOUSE WHOM THEY (MAJOR BLACKARD, LT. FRENCH, C/O BOITNOTT, AND C/O GRIFFITH) WANTED TO MAKE AN EXAMPLE OF, WHICH WERE C/O GRIFFITH'S EXACT WORDS. UPON ENTERING CELL #102, I IMMEDIATELY OBSERVED THAT ABOUT 75% OF THE CELL WAS SMEARED IN FECES AND URINE. IT WAS MOSTLY DRY WITH A FEW MOIST SPOTS ALONG THE 4 WALLS, THE FLOOR, DOOR, AND BUNK AREA. THE SMELL WAS HORRIBLE AND SICKENING! I COULD NOT BELIEVE THE OFFICERS WERE GOING TO PUT AN INMATE IN THAT CELL AND SUBJECT THAT INMATE TO SUCH CRUEL AND INHUMANE CONDITIONS! I THEN OVERHEARD C/O GRIFFITH TELL C/O BOITNOTT "WAIT TILL I'M CASTELLANOS REALIZES THAT THE MAIN WATER VALVE TO CELL #102 HAS BEEN SHUT OFF AND THERE'S NO WAY TO TRY TO CLEAN ALL THAT SHIT AND PISS ALL OVER THE CELL. HE'S GOING TO START BANGING ON THAT DOOR LIKE A MANIAC AND THEN I'LL BE ABLE TO WRITE HIS ASS UP AND JUSTIFY IT."        (OVER) NEXT PAGE

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury that Everything contained herein is true and accurate to the best of my knowledge and belief. I do declare and affirm that the matter at hand is not taken either frivolously or maliciously and that I believe the foregoing matter is taken in good faith.

Signed on this 17th day of _NOVEMBER_    2011

_Allen Kronenberger #K62101_
                                          Affiant

THE NEXT day ON THE 16th of July 2011 dURING THE 7:00 A.M TO 3:00 P.M SHIFT AS A PORTER IN THE WEST CELL HOUSE C/O GRIFFITH ORDERED ME TO PREPARE A CLEAN MOP HEAD AND WATER BUCKETT, BUT NOT TO USE ANY dISINFECT OR SOAP. LATER. I LEARNED THAT WARDEN PFISTER HAD ORDERED THE SUBSTITUTE LUTINENT TROY E DAVIS TO GET SOMEONE TO CLEAN CELL # 102. THE ORDER FROM THE LUTINENT WAS PASSED dOWN TO C/O GRIFFITH IN WHICH C/O GRIFFITH NOMINATED ME TO CLEAN. UPON ENTERING CELL #102 ONCE AGAIN, I TRIED TO HOLD MY BREATH AND DO AS LITTLE WORK POSSIBLE AND AND AS QUICKLY AS POSSIBLE TO KEEP FROM GETTING SICK. FOR ONE I WASN'T ALLOWED TO USE ANY KIND OF dISINFECT OR SOAP IN THE MOP WATER BUCKETT WATER OR dIRECTLY ON HE CELL WALLS, SINK, TOILETT, FLOOR, OR dOOR. THIS WAS A DIRECT ORDER BY C/O GRIFFITH REPEATED TO ME SEVERAL TIMES "ABSOLUTELY NO dISINFECT OR SOAP OF ANY KIND! JUST MAKE IT LOOK GOOD." LATER ON THAT day I NOTICED I/m CASTELLANOS WAS SLEEPING ON ON THE FLOOR DUE TO NO MATTRESS BEING IN THE CELL WHICH THE day BEFORE I WAS ORDERD TO TAKE IT OUT BY C/O GRIFFITH.

ON THE 18th of July 2011 dURING THE 7:00 A.M TO 3:00 P.M SHIFT AS A PORTER IN THE WEST CELL HOUSE C/O GRIFFITH ORDERED ME TO GET A CLEAN MOP HEAD AND MOP WATER BUCKETT WITH ALL THE dISINFECT AND SOAP THAT WAS AVAILABLE, BECAUSE THIS TIME HE(C/O GRIFFITH) "NEEDED TO MAKE SURE THAT CELL #102 WAS CLEANED FROM ~~WALL TO WALL~~ WALL TO FLOOR TO CEILING INCLUDEING THE STEEL dOOR AND BUNK BECAUSE WARDEN PFISTER WOULD BE STOPPING BY LATTER THIS AFTERNOON TO INSPECT I/m CASTELLANOS CELL. I ASSERT AFTER SPENDING A GOOD HOUR AND A HALF CLEANING AND dISINFECTING THIS PARTICULAR CELL TO MAKE IT SOMEWHAT LIVABLE AND BREATHEABLE AGAIN C/O GRIFFITH THEN ORDERED ME TO BRING A MATTRESS INTO THE CELL(#102) FROM THE STORAGE ROOM, AND TO HELP HIM TURN ON THE WATER VALVE THAT SUPPLIES WATER TO CELL #102, AT THAT MOMENT THE LAST FEW days REALLY SUNK IN, THE depth AND MAGNITUDE OF THE pHYSICAL, MENTAL, AND EMOTIONAL PAIN THAT WAS INFLICTED ON I/m CASTELLANOS. I ALSO REALIZED THAT THE OFFICERS WERE ALL WORKING TOGETHER TO pHYSICALLY TORTURE AND INFLICT EMOTIONAL ANGUISH ON I/m CASTELLANOS.

*Allen Kronenberger #K62101*

SUBSCRIBED AND SWORN TO BEFORE ME ON THIS 17 day OF Nov 2011

NOTARY PUBLIC

OFFICIAL SEAL
PAULA G. RICH
Notary Public - State of Illinois
My Commission Expires Apr 23, 2014

Exhibit #2

## 20 ILLINOIS ADMINISTRATIVE CODE   CH. 1 SEC. 504
### SUBCHAPTER e

### SUBPART F: GRIEVANCE PROCEDURES FOR OFFENDERS

Section
504.800  Applicability
504.802  Definitions
504.805  Responsibilities
504.810  Filing of Grievances
504.820  Grievance Officer
504.830  Grievance Procedures
504.840  Emergency Procedures
504.850  Appeals
504.860  Records
504.870  Direct Review by Administrative Review Board

### SUBPART G: GRIEVANCE PROCEDURES FOR RELEASEES

Section
504.900  Applicability
504.905  Definitions
504.910  Responsibilities
504.920  Filing of Grievances
504.930  Review of Grievances
504.940  Appeals

APPENDIX A    Offense Numbers and Definitions

TABLE A    Maximum Penalties for Adult Offenders
TABLE B    Maximum Penalties for Juvenile Offenders
TABLE C    Offenses and Maximum Penalties -- Community Services Division (Repealed)

AUTHORITY: Implementing the Americans With Disabilities Act of 1990 (42 USC 12101 et seq.) and implementing and authorized by Sections 3-2-2, 3-5-2, 3-6-3, 3-8-7, 3-8-8, 3-10-8, and 3-10-9 of the Unified Code of Corrections [730 ILCS 5/3-2-2, 3-5-2, 3-6-3, 3-8-7, 3-8-8, 3-10-8, and 3-10-9]. Sections 504.70 and 504.450 are implementing a Consent Decree (U.S. Department of Justice vs. the State of Illinois, #S-CIV-76-0158, S.D. Ill., 1978). Sections 504.80 and 504.460 are also implementing a Consent Order (Arsberry vs. Sielaff, #74 C 1918 and Longstreet vs. Sielaff, #74 C 1951, N.D. Ill., 1982).

SOURCE: Adopted at 8 Ill. Reg. 14427, effective August 1, 1984; amended at 12 Ill. Reg. 8351, effective June 1, 1988; amended at 16 Ill. Reg. 10430, effective July 1, 1992; amended at 22 Ill. Reg. 1206, effective January 1, 1998; amended at 25 Ill. Reg. 10775, effective September 1, 2001; amended at 27 Ill. Reg. 6214, effective May 1, 2003.

Page 3 of 52

## 20 ILLINOIS ADMINISTRATIVE CODE   CH. 1 SEC. 504
### SUBCHAPTER e

### SUBPART A:  ADMINISTRATION OF DISCIPLINE

**Section 504.10  Applicability**

This Subpart applies to adult and juvenile offenders within the Department of Corrections.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.12  Definitions**

"Chief Administrative Officer" means the highest ranking official of a correctional facility.

"Department" means the Department of Corrections.

"Director" means the Director of the Department of Corrections.

"Offender" means a person committed to the Department or to the custody of the Department.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.15  Responsibilities**

a)   Unless otherwise specified, the Director or Chief Administrative Officer may delegate responsibilities stated in this Subpart to another person or persons or designate another person or persons to perform the duties specified.

b)   No other individual may routinely perform duties whenever a Section in this Subpart specifically states the Director or Chief Administrative Officer shall personally perform the duties.  However, the Director or Chief Administrative Officer may designate another person or persons to perform the duties during periods of his or her temporary absence or in an emergency.

(Source: Amended at 22 Ill. Reg. 1206, effective January 1, 1998)

**Section 504.20  Offenses and Maximum Penalties**

Disciplinary offenses are defined in Appendix A.  Maximum penalties for conduct that constitutes a disciplinary offense are set forth in Table A for adult offenders and in Table B for juvenile offenders.



a)   No offender shall be found guilty of any violation of these rules without a hearing before the Adjustment Committee or Program Unit.  If an offender is transferred

Page 4 of 52



Exhibit #3

from one facility to another while pending a hearing, the individual shall be provided with an opportunity to present a defense at any subsequent disciplinary hearing held at the receiving facility that is comparable to that which would have been afforded, in accordance with this Subpart, at the sending facility.

b) In determining the appropriate sanctions, the Adjustment Committee or Program Unit, the Chief Administrative Officer, and the Director may consider, among other matters, mitigating or aggravating factors such as:

1) The offender's mental state at the time of committing the offense;

2) The extent and degree of participation in the commission of the offense;

3) The amount or nature of stolen property, contraband, or injury; and

4) The offender's prior disciplinary record.

c) Corporal punishment, disciplinary restrictions on diet, medical or sanitary facilities, clothing, bedding, mail, or access to legal materials and reductions in the frequency of use of toilets, washbowls, and showers shall be prohibited.

d) Disciplinary restrictions on visitation, work, education, or program assignments and use of the library shall be related as closely as practicable to the abuse of such privileges. This subsection shall not apply to segregation or isolation of offenders for purposes of institutional control.

e) Offenders are presumed to be responsible for any contraband or other property prohibited by this Part that is located on their person, within their cell or within areas of their housing, work, educational, or vocational assignment that are under their control. Areas under an offender's control include, but are not limited to, the door track, window ledge, ventilation unit, plumbing, and the offender's desk, cabinet, shelving, storage area, bed, and bedding materials in his or her housing assignment; and desk, cubicle, work station, and locker in his or her work, educational, or vocational assignment. If the offender produces evidence that convinces the Adjustment Committee or Program Unit that he or she did not commit the offense, the offender shall be found not guilty.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

Section 504.30 Preparation of Disciplinary Reports

a) Every employee has the duty to observe the conduct of offenders.

b) If an employee observes an adult offender committing an offense, discovers evidence of its commission, or receives information from a reliable witness of

such conduct, the employee shall promptly prepare a disciplinary report. However, if the infraction is one of those listed in the 400 series in Table A and the employee determines a disciplinary report is not necessary to resolve the situation, the employee may orally reprimand the offender.

c) If an employee observes a juvenile offender committing an offense, discovers evidence of its commission, or receives information from a reliable witness of such conduct, the employee shall promptly prepare a disciplinary report provided the conduct is such that it may result in disciplinary action that suspends privileges, involves the imposition of disciplinary confinement, delays referral to the Prisoner Review Board, or causes a change in work, education, or other program assignments of more than 7 days duration. When the rule infraction is minor, every effort should be made to take corrective action that is adapted to individual circumstances, administered immediately and consistently, and is understood by the offender through appropriate counseling efforts.

d) The disciplinary report must be fully completed. The reporting employee shall provide the following information to the extent known or available.

1) The name and register number of the offender.

2) The place, time, and date of the offense.

3) The offense that the offender is alleged to have committed.

4) A written statement of the conduct observed.

5) The names of offenders, employees, and visitors who were witnesses. The identity of witnesses may be withheld for reasons of security provided a statement to that effect and the information the confidential source provided are included on the disciplinary report to the extent the information can be included without jeopardizing security.

6) The signature of the reporting employee and the date and time the report is completed.

e) If an offender is suspected of committing a disciplinary offense, an investigative disciplinary report, hereinafter referred to as an investigative report, may be issued that reasonably informs the offender of the subject of the investigation to the extent that safety and security allow.

f) Service of a disciplinary report upon the offender shall commence the disciplinary proceeding. In no event shall a disciplinary report or investigative report be served upon an adult offender more than 8 days, or on a juvenile offender more